**WO**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Dudley Greer, dba Greer Farms, | )  No. CV-10-0799-PHX-SMM |
| Plaintiff, | )  **ORDER** |
| v. | ) |
| T.F. Thompson & Sons, Inc., | ) |
| Defendant. | ) |
| T.F. Thompson & Sons, Inc., | ) |
| Counter-Plaintiff. | ) |
| v. | ) |
| Dudley Greer, dba Greer Farms, | ) |
| Counter-Defendant. | ) |

Before the Court are Defendant/Counter-Plaintiff T.F. Thompson & Sons, Inc.'s ("Thompson"): (1) Motion in Limine to Exclude the Expert Testimony of Dr. Julian Whaley (Doc. 94) and (2) Motion for Summary Judgment (Doc. 95). Plaintiff/Counter-Defendant Dudley Greer ("Greer") has responded to both motions (Doc. 104; Doc. 105), Thompson has replied to both (Doc. 108; Doc. 109), and the matters are now fully briefed.[1]

---

[1] Thompson requested oral argument in both its Motion in Limine (Doc. 94) and Motion for Summary Judgment (Doc. 95). The parties have had the opportunity to submit briefing. Accordingly, the Court finds the pending motions suitable for decision without oral argument and Thompson's request is denied. See L.R. Civ. 7.2(f).

**BACKGROUND**

In autumn 2008, Greer, an Arizona farmer who grows red potatoes among other crops, entered into an oral agreement to purchase Red Lasoda seed potatoes from Thompson. (Doc. 96 ¶ 1; Doc. 106 ¶ 14.) Thompson participated in the North Dakota State Seed Certification Program, which required inspections of its seed potato fields during cultivation. (Doc. 96, Exs. 2 & 3.) Thompson stored its seed potatoes for about 40 days before its first shipment to Greer on November 14, 2008. (Doc. 96 ¶ 6, Ex. 6.) Before Thompson's shipment to Greer, North Dakota State Seed Inspectors inspected seed potato samples as they were loaded for delivery. (Doc. 96 ¶ 7; Doc. 106 ¶ 4.) The inspectors certified the Thompson seed potatoes shipped to Greer as "first grade" or "blue-tagged," meaning that the samples were free from visible defects. (Doc. 96 ¶ 8; Doc. 106 ¶ 5.)

Fifteen truckloads of Thompson's seed potatoes arrived at Greer's facility between November 2008 and January 2009. (Doc. 96 ¶ 2; Doc. 106 ¶ 15.) Greer's seed potato receivers inspected the delivery and noted no problems. (Doc. 96 ¶¶ 9-10.) Greer stored, chemically treated, and warmed the seed potatoes for about three to four weeks to prepare them for cutting and planting. (Doc. 96 ¶¶ 11-12; Doc. 106 ¶ 16.) Greer employees responsible for cutting the sprouting seed potatoes noted no problems with the cut seed potatoes. (Doc. 96 ¶¶ 13-15.) After cutting, the seeds were dried, then trucked to Greer's fields in Waddell, Arizona for planting. (Doc. 96 ¶ 16.) Greer's planters did not note any problems with the seed potatoes during planting, which occurred from about December 11, 2008 to February 3, 2009. (Doc. 96 ¶ 18; Doc. 106 ¶ 17.) Thompson's seed potatoes were planted alongside seed potatoes from at least three other growers. (Doc. 96 ¶ 19.) Greer paid Thompson $69,414.80 for the first twelve loads of delivered seed potatoes, but did not pay the $17,370.60 owed on the final three loads delivered in January 2009. (Doc. 96 ¶ 33.)

After experiencing problems with crop yield and allegedly noticing decayed and rotted crops in the ground, Greer submitted seed potato samples for laboratory testing. (Doc. 106 ¶¶ 18-19.) In March 2009, a testing laboratory at Oregon State University isolated

Phytophthora Erythroseptica ("P. Erythroseptica"), a soil-borne organism that causes the disease Pink Rot, from decaying potato tubers apparently taken from Greer's fields. (Doc. 96 ¶ 21; Doc. 106 ¶¶ 7, 21, Ex. C.) Greer asserts that Pink Rot is associated with high soil moisture at the time potato tubers reach maturity, and that rainy weather during harvest caused parts of Thompson's fields to be covered in water. (Doc. 106 ¶¶ 22-28.) In June 2009, Thompson commissioned its own analysis of potato samples in Greer's fields, and detected the pathogen Sclerotium Rolfsii ("S. Rolfsii"), which causes the disease Southern Blight. (Doc. 96 ¶ 23.) In mid-July 2009, Greer tested for S. Rolfsii, and found it in three of the seven fields that contained Thompson's seed potatoes, and also in a field where Thompson's seed potatoes had not been planted. (Doc. 96 ¶ 24; Doc. 106 ¶¶ 29-33.) All of Greer's fields containing S. Rolfsii were also planted with corn, which according to one study cited by Thompson is susceptible to S. Rolfsii, before or at the same time as the seed potatoes were planted. (Doc. 96 ¶ 25 & Ex. 22.) There is no evidence that either P. Erythroseptica or S. Rolfsii (collectively the "two pathogens") has been found on Thompson's land. (Doc. 96 ¶ 26.) Thompson, relying on the deposition of its expert, Gary Secor, Ph.D., asserts that although S. Rolfsii has never before been found in North Dakota soil or potatoes, it is common in Arizona and other high temperature climates. (Doc. 96 ¶¶ 28-29, Ex. 21 at 86.) Greer disputes this by citing to a publication stating that the fungi is "widely prevalent" in North Dakota but does not rebut the assertion that S. Rolfsii has not been found in potatoes in that state. (Doc. 106 ¶¶ 11, 53, 56.) Thompson further contends that seed potatoes with Pink Rot exhibit a strong smell, rapid decay, and a distinctive color change within 10 to 60 days of harvest, while Greer contends that the disease may remain latent in seed potatoes maintained at cold temperatures. (Doc. 96 ¶¶ 31-32; Doc. 106 ¶ 12.)

Greer alleges that the two pathogens infected the seed potatoes ordered from Thompson, leading to extensive damage to Greer's potato crop and business. (Doc. 106 ¶¶ 34-36.) On April 12, 2010, Greer brought this diversity lawsuit against Thompson and the now-dismissed Clemenson Sales Co. alleging: (1) breach of contract/express warranty; (2)

breach of implied warranty of merchantability; (3) breach of implied warranty of fitness for a particular purpose; (4) breach of implied covenant of good faith and fair dealing; (5) negligence; and (6) fraudulent Concealment. (Doc. 1 at 5-8.) Thompson filed a Counterclaim for breach of contract, alleging that Greer has failed to pay $17,370.60 owed Thompson for the final three delivered loads of seed potatoes. (Doc. 15 at 7.)

In support of its case, Greer cites to its expert, Dr. Julian W. Whaley, Ph.D. ("Whaley") (Doc. 106 ¶¶ 37-56.) Whaley opined in his report, based primarily on the alleged pattern of disease evident in Greer's fields, that the two pathogens first infected Thompson's seed potatoes while being grown in North Dakota and then spread throughout Greer's fields soon after the seed potatoes' planting. (Doc. 94-2 at 2-3, 9.) Whaley further stated that P. Erythroseptica is established in North Dakota and that wet weather conditions while Thompson's seed potatoes were growing in North Dakota were conducive to Pink Rot. (Doc. 94-2 at 6-7, 9.) Whaley opined that because there was apparently no prior or subsequent history of the two pathogens in Greer's fields, the Thompson seed potatoes were their source. (Doc. 94-2 at 5.) The inspectors in North Dakota did not discover the diseased seed potatoes, Whaley opined, either because the sample size of seed potatoes inspected was too small or because the seed potatoes were inspected during an incubation period when symptoms were not apparent. (Doc. 94-2 at 9.) Another plant pathologist, Paul Santos, M.S., has also stated that the spread of disease in Greer's fields was likely caused by the large-scale introduction of contaminated seed potatoes. (Doc. 106 ¶¶ 54-55.)

## LEGAL STANDARDS

### I.    Motion to Exclude Expert Witness

A witness who has been qualified as an expert by knowledge, skill, experience, training, or education may give an opinion on scientific, technical, or otherwise specialized topics ". . . if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. Trial judges have a

- 4 -

responsibility to act as gatekeepers to exclude all types of unreliable expert testimony. Fed. R. Evid. 702 (Advisory Committee's Notes 2000 Amendments). To exercise this responsibility, " . . . the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999). Daubert v. Merrell Dow Pharmaceuticals sets forth a two-part test for admitting expert testimony that focuses on the reliability and relevancy of the opinion. 509 U.S. 579, 589 (1993). To be sufficiently reliable, the opinion must be based on "scientifically valid principles." Id. at 595. To be relevant, the testimony must "assist the trier of fact to . . . determine a fact in issue." Id. at 592 (quoting Fed. R. Evid. 702). The burden is on " . . . the party proffering the evidence [to] explain the expert's methodology and demonstrate in some objectively verifiable way that the expert has both chosen a reliable scientific method and followed it faithfully." Daubert v. Merrell Dow Pharm., 43 F.3d 1311, 1319 (9th Cir. 1995). Factors that courts have used to evaluate the reliability of an expert's methods include:

1.      Whether the expert's method is falsifiable or merely conclusory;

2.      Whether the technique has been subject to peer review and publication;

3.      The known or potential error rate of the technique;

4.      The existence and maintenance of standards and controls;

5.      Whether the technique has general acceptance in the relevant expert community;

6.      Whether the substance of the testimony was prepared specifically for the instant litigation;

7.      Whether the expert's extrapolation from an accepted premise to his conclusion was justifiable;

8.      Whether the expert has adequately accounted for obvious alternative explanations;

9.      Whether the expert "is being as careful as he would be in his professional work outside his paid litigation consulting";

10.   Whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.

See Daubert, 509 U.S. at 593-595; Daubert, 43 F.3d at 1317; see Claar v. Burlington N.R.R., 29 F.3d 499 (9th Cir. 1994); see Kumho, 526 U.S. at 149-151; Fed. R. Evid. 702 (Advisory Committee's Notes 2000 Amendments). These factors are neither required nor exhaustive. See Fed. R. Evid. 702 (Advisory Committee's Notes 2000 Amendments). Additionally, no single factor is necessarily dispositive of the reliability of an expert's testimony. Id. The objective "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho, 526 U.S. at 152.

**II.   Motion for Summary Judgment**

A court must grant summary judgment if the pleadings and supporting documents, viewed in the light most favorable to the nonmoving party, "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Jesinger v. Nev. Fed. Credit Union, 24 F.3d 1127, 1130 (9th Cir. 1994). Substantive law determines which facts are material. See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); see also Jesinger, 24 F.3d at 1130. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. The dispute must also be genuine, that is, the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." Id.; see Jesinger, 24 F.3d at 1130.

A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." Celotex, 477 U.S. at 323-24. Summary judgment is appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322; see also Citadel Holding Corp. v. Roven, 26 F.3d 960, 964 (9th Cir. 1994). The

moving party need not disprove matters on which the opponent has the burden of proof at trial. See Celotex, 477 U.S. at 323-24. The party opposing summary judgment need not produce evidence "in a form that would be admissible at trial in order to avoid summary judgment." Id. at 324. However, the nonmovant must set out specific facts showing a genuine dispute for trial. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585-88 (1986); Brinson v. Linda Rose Joint Venture, 53 F.3d 1044, 1049 (9th Cir. 1995).

**DISCUSSION**

**I.      Thompson's Motion in Limine**

Thompson requests that the Court exclude Whaley's testimony under Federal Rule of Evidence 702. (Doc. 94.) It is undisputed that Whaley is qualified as an expert by "knowledge, skill, experience, training, or education." (Doc. 94 at (quoting Fed. R. Evid. 702). As mentioned above, Daubert requires that expert testimony be relevant to the facts of the case and sufficiently reliable. 509 U.S. at 589. The Court finds that Whaley's conclusions and the method used to reach these conclusions would be relevant to the trier of fact "to determine a fact in issue," namely the origination and spread of the two alleged pathogens. Fed. R. Evid. 702.

Thus, the only question is whether Whaley's testimony is sufficiently reliable. Thompson asserts that Whaley's methods fell short of satisfying Federal Rule of Evidence 702 because they were conclusory, lacked any standards or controls, were not accepted in the relevant expert community, were prepared for the instant litigation, were not scientifically reasonable, and failed to account for alternative explanations. (Doc. 94; Doc. 108 at 10-11.) Whaley's expert report and his affidavit attached to Greer's response both attempted to address these issues. (Doc. 94-2, Doc. 104-1.)

In exercising its gatekeeping responsibility, the Court finds that Whaley's testimony does not meet the Daubert reliability standard. First, Whaley's conclusions fails to employ appropriate principles and methods  to account for how Thompson's allegedly diseased seed potatoes passed undetected by inspectors that were part of the North Dakota State Seed

Certification Program and by Greer's own seed potato receivers and cutters. (Doc. 96 ¶¶ 8-10, 13-15; Doc. 106 ¶ 5.) Whaley's expert report merely surmises that "I think the relatively small samples are not enough sometimes and perhaps they were examined during the incubation period when symptoms are not obvious." (Doc. 94-2 at 9.) Whaley makes this assumption without any evidence that a pathogen, even if it survived in a dormant or latent state, could cause disease in North Dakota seed potatoes in the manner alleged. Such speculation is not based on scientifically valid principles and it is not objectively verifiable that Whaley chose "a reliable scientific method and followed it faithfully." <u>Daubert</u>, 43 F.3d at 1319.

Second, Whaley's conclusion "that the pattern of disease development in the Greer Farms field is definitely one caused by planting diseased seed pieces" is not supported by appropriate scientific principles and methods. (Doc. 94-2 at 9.) Whaley based his opinion on purported "planter patterns" in Greer's fields that he opined demonstrated that diseased seed potatoes damaged the fields. (Doc. 94-2 at 4.) However, Whaley's conclusions that the planter patterns existed in Greer's fields are based upon observations by Greer representatives and often poor-quality photographic documentation of the fields. (Doc. 94-2 at 4-5.) Thus, the basis for Whaley's planter pattern theory is not grounded in scientific methods or principles, and the planter pattern theory itself is insufficiently supported. (Doc. 94-2 at 4-5.)

Third, Whaley's opinion on the origins of the two pathogens that allegedly damaged Greer's fields is not based in scientific methods or principles. Whaley states in his report that S. Rolfsii has never been reported in North Dakota (although he "would expect it [to be reported] in the future]." (Doc. 94-2 at 6.) A study that Whaley refers to in a subsequent declaration lists S. Rolfsii as a widely prevalent pathogen in North Dakota; however the appropriateness of including S. Rolfsi in that listing has been called into question by the study's own author. (Doc. 104-1 ¶¶ 22-23; Doc. 109-3 at 2.) As to P. Erythroseptica, Whaley has merely theorized that wet fields might make Thompson's seed potatoes more susceptible

to the pathogen, which provides an insufficient scientific basis to conclude that Thompson's seed potatoes were infected. Dr. Whaley also cites to reports from Greer's representatives that these problems had not occurred prior to 2009 and on overall yield data for Greer's fields. (Doc. 94-2 at 2, 5.) However, such data is not pertinent for the purposes of concluding that the two pathogens derived from Thompson's seed potatoes.

Fourth, Whaley states that "[a]n argument is made that others received potatoes from defendants and had no problem. This is possible because some of the fields or portion of same were disease free." (Doc. 94-2 at 9.) Again, such speculation is unsupported, and does not meet the standard set forth for reliability.

Fifth, Whaley's method does not meet the reliability standard based on other factors, as Whaley's method is conclusory, does not demonstrate any standards and controls, was prepared specifically for this litigation, and does not adequately account for alternative explanations regarding the origins of the pathogens and the alleged damage caused. See Daubert, 509 U.S. at 593-595; Daubert, 43 F.3d at 1317; see Kumho, 526 U.S. at 149-151; Fed. R. Evid. 702 (Advisory Committee's Notes 2000 Amendments). Whaley also fails to demonstrate that the methods employed in this case are generally accepted in the relevant expert community, have been subject to peer review and publication, or are otherwise grounded in scientific support. See id. The Court therefore concludes as a matter of law that Whaley's methods do not meet the standards set by Daubert. Thus, the Court will grant Thompson's Motion in Limine.

**II.    Thompson's Motion for Summary Judgment**

**A.    Motion for Summary Judgment on Greer's Claims**

Thompson seeks summary judgment on all six of Greer's causes of action on grounds that Greer has provided insufficient evidence that the two pathogens originated with Thompson's soil or seed potatoes. (Doc. 95 at 11.) Greer states that Whaley's opinion, along with additional facts in this case, give rise to a material dispute preventing summary

judgment. (Doc. 104.) The Court will consider the parties' arguments in light of Greer's six causes of action.

Greer's first four causes of action are contract-related claims alleging: (1) breach of contract/express warranty; (2) breach of implied warranty of merchantability; (3) breach of implied warranty of fitness for a particular purpose; and (4) breach of implied covenant of good faith and fair dealing. (Doc. 1 at 5-7.) Greer's Complaint alleges that Thompson has breached all three warranties and the covenant of good faith and fair dealing by agreeing to deliver seed potatoes suitable for producing potatoes for sale, but instead providing infected seed potatoes that could not be successfully cultivated. (Doc. 1 at 5-6.) Thompson contends in its Motion for Summary Judgment that it is not liable to Greer, as there is insufficient evidence that the two pathogens originated from its seed potatoes or that the two pathogens existed in its seed potatoes prior to planting. (Doc. 95 at 11-14.)

A seller creates an express warranty by first making an affirmation of fact, promise, or description relating to the goods which becomes the basis for the bargain, and then violating that affirmation, promise, or description. Ariz. Rev. Stat. § 47-2313. A warranty of merchantability "is implied in a contract for [a good's] sale if the seller is a merchant with respect to goods of that kind." Ariz. Rev. Stat. § 47-2314(A). The goods must "[p]ass without objection in the trade . . . ." and be "fit for the ordinary purposes for which such goods are used." Id. § 47-2314(B). An implied warranty of fitness for a particular purpose occurs "[w]here the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods." Ariz. Rev. Stat. § 47-2315. "Every contract contains implied covenants of good faith and fair dealing." Johnson Int'l v. City of Phoenix, 967 P.2d 607, 614-15 (Ariz. Ct. App. 1998). "The essence of that duty is that neither party will act to impair the right of the other to receive the benefits which flow from their agreement or contractual relationship." Rawlings v. Apodaca, 726 P.2d 565, 569-70 (Ariz. 1986).

1    Greer's fifth cause of action alleges negligence because Thompson "knew or should

2 have known that harvesting seed potatoes under wet conditions presented an unreasonable

3 risk of transmitting pathogens," requiring it to exercise care in providing seed potatoes to

4 Greer and protecting Greer from foreseeable harm. (Doc. 1 ¶¶ 41-42.) Thompson asserts that

5 there was no negligence absent evidence of the two pathogens' existence prior to planting

6 of the seed potatoes in Greer's fields. (Doc. 95 at 14.) "To establish a claim for negligence,

7 a plaintiff must prove four elements: (1) a duty requiring the defendant to conform to a

8 certain standard of care; (2) a breach by the defendant of that standard; (3) a causal

9 connection between the defendant's conduct and the resulting injury; and (4) actual damages.

10 Gibson v. Kasey, 150 P.3d 228, 230 (Ariz. 2007).

11    Greer's sixth cause of action alleges fraudulent concealment on grounds that although

12 Thompson had a duty to inform it "of the risk presented by the wet conditions at the time of

13 harvest," Thompson is liable because it "intentionally withheld this information from Greer

14 in order to complete the sale," leading to damages. (Doc. 1 ¶¶ 43-46.) Thompson contends

15 that as there was no evidence that the seed potatoes were infected before planting in Greer's

16 fields, fraudulent concealment could not have occurred. (Doc. 95 at 14.) Fraudulent

17 concealment requires "(1) the concealment of a material existing fact that in equity and good

18 conscience should be disclosed; (2) knowledge on the part of the party against whom the

19 claim is asserted that such a fact is being concealed; (3) ignorance of that fact on the part of

20 the one from whom the fact is concealed; (4) the intention that the concealment be acted

21 upon; and (5) action on the concealment resulting in damages." Coleman v. Watts, 87

22 F.Supp.2d 944, 951-52 (D. Ariz. 1998).

23    The Court will grant Thompson's request for summary judgment on all of Greer's

24 claims. See Fed. R. Civ. P. 56(a); see Anderson, 477 U.S. at 248. Although Thompson was

25 to provide Greer with seed potatoes free of significant defects that would become healthy,

26 marketable potatoes, Greer has not met its burden in demonstrating that the two pathogens

27

28

originated with Thompson's seed potatoes or accompanying soil or that the two pathogens caused the alleged damage to Greer's fields.

First, neither North Dakota state seed inspectors nor Greer's trained receivers and cutters noticed any problems with Thompson's seed potatoes when they were inspected prior to planting. (Doc. 96, Exs. 2 & 3; Doc. 96 ¶¶ 7, 9-10, 13-15; Doc. 106 ¶ 4.) Other than the unreliable opinion of Greer's expert Whaley, Greer provides no support for its contention that the inspectors in North Dakota did not discover the diseased seed potatoes either because the sample size of seed potatoes inspected was too small or because the seed potatoes were inspected during an incubation period when symptoms were not apparent. (Doc. 94-2 at 9.) Further, Greer has not presented a reasonable account of why Greer's own receivers and cutters failed to notice the disease, absent Whaley's speculative latency theory. (Doc. 96 ¶¶ 13-15, 18; Doc. 106 ¶ 17.) Second, the mere fact that there is some evidence that the outbreak of the two pathogens in Greer's fields coincided with the delivery of Thompson's seed potatoes and occurred in many of the same places where Thompson's seed potatoes were planted is insufficient absent any tangible evidence of causation. (Doc. 106 ¶¶ 17-19.) The mere possibility that the two pathogens originated with Thompson's seed potatoes pales in comparison to the likelihood that they derived from Greer's soil or the numerous other sources of crops planted in Greer's fields. (Doc. 96 ¶ 19.) Third, the presentation of some evidence that the wet conditions present on Thompson's land during harvest may contribute to the transmission of Pink Rot does not counterbalance the strong evidence that neither of the two pathogens has been found on Thompson's land. (Doc. 96 ¶ 26; Doc. 106 ¶¶ 22-28.)

As an additional and separate basis for granting Summary Judgment on Greer's fraudulent concealment and negligence claim, the Court finds that Thompson could not have fraudulently concealed and did not have a duty to protect Greer from two pathogens that it had little reason to know existed and had even less reason to believe would pose a problem for Greer, even if the seed potatoes were harvested in wet conditions. See Anderson, 477 U.S. at 248. Accordingly, the Court will grant summary judgment on Greer's claims for

breach of contract/express warranty, breach of implied warranty of merchantability, breach of implied warranty of fitness for a particular purpose, breach of implied covenant of good faith and fair dealing, negligence, and fraudulent concealment.

**B.     Motion for Summary Judgment on Thompson's Counterclaim**

Thompson also seeks summary judgment on its breach of contract counterclaim and asserts that it is undisputed that Greer has failed to pay Thompson $17,370.60 for three loads of seed potatoes delivered in January 2009. (Doc. 95 at 15.) The Court has already granted summary judgment on all of Greer's claims, which leaves only Thompson's counterclaim. The amount in controversy in Thompson's counterclaim is $17,370.60, far less than the jurisdictional requirement of $75,000. "The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . (3) the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). As the Court has dismissed all of Greer's claims from which it had original jurisdiction, it will not exercise supplemental jurisdiction over Thompson's counterclaim. 28 U.S.C. § 1367(c)(3); see also St. Paul Mercury Indem. Co. v. Red Cab Co., 303 U.S. 283, 289 (1938) (To justify dismissal, "[i]t must appear to a legal certainty that the claim is really for less than the jurisdictional amount."). Accordingly, Thompson's counterclaim is dismissed.

<strong>CONCLUSION</strong>

**IT IS HEREBY ORDERED GRANTING** Thompson's Motion in Limine (Doc. 94).

**IT IF FURTHER ORDERED GRANTING IN PART AND DENYING IN PART** Thompson's Motion for Summary Judgment (Doc. 95).

**IT IS FURTHER ORDERED GRANTING** Thompson's Motion for Summary Judgment on Greer's Claims.

**IT IS FURTHER ORDERED DISMISSING** Thompson's Counterclaim.

/ / /

/ / /

/ / /

**IT IS FURTHER ORDERED DENYING** Thompson's Motion for Summary Judgment on Thompson's Counterclaim as moot.

DATED this 3rd day of November, 2011.

Stephen M. McNamee
United States District Judge